Good afternoon. Go ahead and call United States v. William Valentin. Counsel for Mr. Valentin? Yes. Your Honor, Anthony Pope on behalf of Mr. Valentin. Good afternoon, Your Honor. Joseph Alter, also on behalf of Mr. Valentin. All right. Thank you. Your Honor, I am following exactly what the court has indicated in the email as far as what you want to be heard, what you want to hear me speak about. And it is, number one, whether brandishing a firearm in violation of the 18 United States Code 924 qualifies as a crime of violence for the purposes of U.S. Sentencing Guidelines 4B11A. I take the position, Your Honor, that it does not. And the reason it does not is because of the ambiguity. Before you get too far, were you saving time for rebuttal, Mr. Pope? I was, Your Honor. Five minutes? Five minutes. Okay. Yes. Thank you, sir. Go ahead. And before you get too far, excuse me. I'm sorry. I understand where you're going with the ambiguity argument. Why is it ambiguous given the jury's verdict here and the underlying conviction? I understand that Scott says it's not a crime of violence, and to that extent, maybe there's an ambiguity. And we look at the definition of Hobbs Act, which includes crimes against property. To that extent, maybe there's an ambiguity. But if I just look to the language of the enhancement, given what he was convicted of in the context of this trial, how do you see an ambiguity there? Because no – brandishing means brandishing, and to me that's not ambiguous. Well, Your Honor, you know, it's interesting because when I look at the sentencing guidelines and the element clause, both of them have either the use of force, attempted use of force, or threatened use of force. The brandishing in which the jury convicted Mr. Valentin, that jury charge was they had to find Valentin made the presence of the firearm known to another person in order to intimidate another person. So it doesn't use the word force, yet when you look at the guidelines and the elements clause, they both have that as a requirement for force, yet the jury was not instructed on that. They were instructed on intimidation. What is the difference between threatening and intimidating? Well, Your Honor, my point being, if I may, is that if this was so crystal clear, if on its face violence was clear as to what it meant, why would the prosecutor then go to the Webster's Dictionary in their argument, their response to us, and say, well, I looked up Webster's Dictionary, and in Webster's Dictionary it says that intimidation is synonymous with force. Well, it doesn't say that. What it says is that it could be forced persuasion to make someone do something. Mr. Pope? Yes. I'm not getting an answer, though, to what Judge McKee just asked. 924C1A2 talks about the brandishing, and it's about in order to intimidate a person. How is that different from an implicit threat of force? What's the difference between intimidating somebody and threatening somebody? Well, the logical, straight-up English language matter. No, I'm talking about force, though. I'm not saying that intimidation and threat doesn't have perhaps the same meaning. What I'm talking about is the use of force. The Elements Clause says that either one of the three for the jury has to be with the use of force. But the jury was charged with intimidation, which may very well equal threat, but where's the force? Well, it's threat of force. Exactly. Right? So the threat of force is I have a gun. Do what I say or I'm going to shoot you. There is a threat of force by pulling the gun out. You don't have to say anything. You pull the gun out and point it at somebody. I think ordinary understanding would be I have just been threatened with force. I could get shot, and that is intimidating. Where's the ambiguity that would lead one to say, yeah, that's intimidating. It might even be threatening, but it doesn't threaten force. Isn't the existence of the force all tied up in the intimidation and the threat because you have a gun pointed at you? But I think there's a subjective nature to it. How are you using it? When you use force, that is identifiable. What did you do? Did you say it? Did you move in the direction of it? What did you do exactly to cause that? You pointed a gun at somebody. Well, no, but there's no pointing. How would that be? But that's not the facts, Judge. The facts and what jury was charged on is the possession of the weapon, looking and seeing the weapon. Who was brandishing it, right? Brandishing means showing it in a manner that communicates, like I got a gun. Well, Judge, but it doesn't mean, see, the actions that you're pointing out, I don't disagree. If you do that, you walk in somewhere and you pull your six-gun and you're pointing it at people or you're saying something, that's one thing. But what the jury was charged on is that they simply had to decide whether Mr. Valentin made the presence of the firearm known to them to intimidate. How do you deal with our Wilson case? I'm sorry, say again? How do you deal with United States v. Wilson, which dealt with, which found an unarmed bank robbery by intimidation satisfied the elements clause? Well, like anything, I think the set of facts were somewhat different than they were in this case. And, you know, again, there we didn't have a Hobbs Act robbery, which is another point I'd like to get to, but I certainly, I hope I answered your question, Your Honor. But, again, each case falls and rises on its own set of facts. We all know that. I mean, after doing it 36 years, I don't find very much to be black and white in the law. Usually it's gray, and the shades of gray are sometimes innumerable. So when I look at the word violence, and you look at the commission, the sentencing commission amendment in 2016, for the simple reason it was amended, is because of the ambiguities. Because if you, if I cite it, I think I cite it, but I said, look, 2016 amendment to definition of crime of violence, definition 4B11, United States sentencing guidelines. As part of this study, the commission considered feedback from the field, including conducting a roundtable discussion on these topics and considering the varying case law interpreting these statutory and guideline definitions. Before you read too much more to us, Mr. Pope, are you suggesting that if the sentencing commission takes evidence, what is produced as a guideline is necessarily ambiguous because they took evidence and they heard from people? No, not necessarily ambiguous, but, you know, I ask respectfully, we have a Hobbs Act, we have a guideline that talks about violence, and then it goes on in the commentary to say unequivocally, not with any confusion, that the underlying offense has to be a crime of violence. And there's no dispute from the government that Hobbs Act robbery is not a crime of violence for career enforcement, for career enhancement. Can you help me understand how we get to, how we get to the commentary through Nasir? Well, because when you look at it and you look at violence and the amendments and you look at brandishing and there's no force charged with the jury, there has to be some analysis as to what was meant by just using 924. Because could we agree on one thing? That 924 usually accompanies another offense. It's very rarely by itself. You need to have a predicate offense. The predicate offense here was completed Hobbs Act robbery, right? But the question isn't, well, I should ask you, do you think the question is whether Hobbs Act robbery involves the threat of force against another person, or is it whether 924C, C1A, requires a threat of force? No, I think either one can, but the difference with Hobbs Act, as I understand it, the reason they can't use it for career enhancement is because of the last word, property. No, we said in, we said in Scott that there was not a categorical match between the statement in the guidelines about robbery and Hobbs Act robbery. We understood that Hobbs Act robbery is broader than the comment, excuse me, than the guideline definition because the guideline requires that to be against another person. But that's not, we don't have that issue here because we're not dealing with whether Hobbs Act and the guidelines categorically match. We're asking whether 924C and the guideline issue necessarily match. That's a different question, right? Yes. And that's a question that we answered in Stoney, didn't we? I, again, Your Honor, I didn't, Stoney was, certainly there's some similarities with the case, but it's not Hobbs Act robbery. No, we did, I mean, in Stoney we said that Hobbs Act robbery is categorically a crime of violence under 924C3A. So we said, if you're looking at Hobbs Act and you're looking at 924C3, there's a categorical match there. Now we're asking the question, 924C3 and the guideline, is there a match there, you know, trying to figure out whether it matches up with 4B1.2A1. And even if Stoney doesn't directly map on that, doesn't Stoney tell us that if you've got a match with the Hobbs Act robbery, you're going to have a match with 4B1.2A1. Because they both require intimidating a person, 924C and the 4B1. They're both requiring that same intimidation or threat. Now you keep talking about a force, but isn't that a force all wrapped up in the threat and the intimidation? I don't know, Your Honor, I mean, but see those questions to me point to ambiguity. If there's questions about something, why would the government in its response go to Webster's Dictionary? If the text was that plain, why do you have to go to get an interpretation or a definition of what intimidation means? That's not what we're supposed to be doing. It's supposed to be either clear or we go to the commentary, which right on point, squarely hits it and says the underlying offense has to be a crime of violence. I don't think anybody's disagreeing, Mr. Hoffman, that if we're in the commentary, if we're in the commentary, you're going to win. Exactly, yes. But the question isn't whether you win because we're in the commentary. And I get there. Yeah, there you go. Your Honor, I realize that. But when I look at this and I see the issues with violence and I see that they took painstaking efforts to talk about Hobbs Act robbery, and there is a property issue, and I see the intimidation being charged at a jury, not the issue of force, but of intimidation, it says to me, wait a minute, let's look further. And now the commentary says, look, Hobbs Act robbery is a crime of violence for sentencing. 924C is a crime of violence for sentencing. As a matter of fact, not only is it for sentencing, it adds seven years. So when we make an assessment of what's enough and appropriate under sentencing, which judges all have to do, you already start off with an enhancement of seven years for a 924C. Indeed, the question we're dealing with is, does he get that extra bump for being a career offender? But we're almost out of time. In fact, we are out of time, and we haven't had a chance yet to ask about the 701 question. Yes, please. Testimony. May I have a quick question? Judge Montgomery V's question about Nassir. Took an antibiotic. I don't think he ever answered that question. I'm sorry, Your Honor. The question is, Judge Montgomery V's asked you about Nassir. I don't think he ever answered that question. How do you get past Nassir, where we said don't? Well, I should let you frame your own question. Yeah, Nassir says you have to identify an ambiguity, and then there's actually additional parts of the test once you identify the ambiguity before you defer to the commentary. Can you walk us through the Nassir analysis? Well, I understand what Nassir says, and when I look at, again, violence, the question is, is violence ambiguous? I believe that's the question. So when you have violence that's used for Hobbs Act robbery but not applicable for career offender, and now you have intimidation with a weapon and no force, under the underlying offense of Hobbs Act robbery, I think that's more than enough to warrant commentary. And when you get to commentary, lo and behold, it squarely hits you in the face that you can't apply it unless the underlying offense is a crime of violence. That's the best I can offer at this point, Your Honor. Thank you. Well, let me just ask Judge McKee or Judge Montgomery V's if they've got any other questions they want to ask about the career offender point. I don't. Okay. Let me ask you to turn to the question of the judge's admission of the lay testimony. The cousin, Ms. Aker, on one side, and the refusal to admit the police officers. Your brief says, and I want to quote it to you, this is at page 19 of the opening brief. It states the following. Like Barber, the better practice, it's in the context of refusing to allow the police officers to testify. The better practice would have been to admit the testimony from these detectives, subject them to cross-examination, and permit the jury to accord their testimony the appropriate weight. So my first question about that is, well, that may have been the better practice. But does following something that's not the better practice necessarily mean you've got abuse of discretion? Because you could still have a justifiable practice. There's no question. I guess if I had the opportunity to take it back, I'd use a different word. But I can say this to you. My position is very clear about it. We had, that was a case dealing with very limited evidence against Mr. Valentin. The evidence, there was no eyewitnesses. There was no DNA. So what you have are two detectives. Should I get to the RC matter first? Yeah. Okay, I'll address that first. Let's just say when you say very limited evidence, he's caught with a piece of jewelry which is clearly from that place. It's a unique custom piece of jewelry from the store. They've got cell data, cell site data. They've got license plate readers. They've got testimony associated with the cash. And then accomplice testimony. So it's not, you know, we don't have CSI style swab his cheek DNA. But there's some very significant evidence, circumstantial and testimonial against your client, right? Well, the circumstantial, the evidence was found, though, five or six months after the incident. So we're dealing with a situation where a jewelry store in Jersey City is robbed. It's a smash and grab type of thing. But for the gun, it would have just been a regular smash and grab. And then months later, somebody has a piece of jewelry. Now, the whole point of people robbing is to sell jewelry. They sell it on the street. So I don't think that's dispositive necessarily of the fact that he was there six months earlier and he was the one with the gun. But if I may point out this, to Your Honor, what I see is missing is identification by somebody that is there, whether it be somebody at the store or someone else, other than the co-defendant. But, Your Honor, if I may, for one second, the co-defendant. I tried the first case when RC, Jonathan RC, was a co-defendant. My client was acquitted. RC, thank you. Yes, RC. Her name is Ashley RC. How to save the name. I appreciate it. No problem. She did not testify in the first trial. In the second trial, she did because Mr. Valentin had a hung jury. My client was acquitted of the first trial, and I came in on the appeal. That witness was probably the worst I've ever seen. The jury charge that addresses confidential witnesses is the only place that I know where it says to a jury, use great care and caution in assessing the testimony of this person. That man admitted to me on cross-examination that he was willing or he was going to run somebody over just to avoid apprehension. Okay. He's a bad character. Understood. But let's get back to the question at hand, which is, did the district court abuse its discretion in denying admission of the detective's identification testimony, and then also admitting the testimony of the cousin, Ms. RC? So on that point, it appears that you've linked the two, that there's something that says you couldn't – they either had to both come in or both stay out. But maybe I'm misreading you. Are you making some linkage there? No. No, I'm not making a linkage at all, Your Honor. As a matter of fact, I'll address – I would like to address simply the two detectives not being allowed to testify because I think that's more relevant. All right. Okay. These two detectives for the state did an investigation and were investigating the matter for some time because the charges against Mr. RC was originally in the state court in Union County. Understood. That's where he was charged. Right, right, right. Those two detectives had worked on that for quite some time and identified – But think about it for a second. What's more powerful for a jury than experienced, trained detectives to have worked on an investigation and then look at a photo and identify the photo as someone other than Will Valentin? I'm hard-pressed to say what that would be. I understand why you're saying that there's evidence that you would want to get in, but I'm trying to figure out how this all works under Fulton. You know, under Fulton, as I understand the case, it says lay witness testimony related to the identification of a suspect is permissible where the witness has had sufficient contact with the defendant to achieve a level of familiarity that renders a lay opinion helpful. Can you help me understand precisely what their contact with the defendant was and why that's sufficient to make their identification helpful?  Sure, Your Honors. They had been investigating the case and Mr. Arce because there was evidence – Mr. Arce had DNA evidence on the car. And the person in the tire shop where they went prior to the robbery identified Mr. Arce. So they had known Mr. Arce, and that's why he was arrested. Mr. Valentin wasn't arrested for some time after that, many, many months. Yeah, but when you say they had known him, isn't the record that they spent about an hour with him, that that was their total exposure to Mr. Arce? Well, only in that particular interview. But they knew of Mr. Arce. I mean, my recollection of it is, again, Mr. Arce did have a prior record. So it wasn't a situation where somebody was new to the law enforcement. And they unequivocally made a statement and there was prima facie showing and an arrest warrant issued because of their testimony. So, I mean, if nothing else, how do you not bring that before a jury to at least cross-examine them and ask them about it or a Rule 104 hearing or something when you allow a cousin to come in? And, listen, you know what? I don't even want to address that because – There's the linkage, right? I'm not even going to address that. I said I wasn't and I'm not going to. I apologize. The two detectives to me are essential. What's more important other than identification? We know that identification puts more wrong people in jail. Here you have a situation where a cooperating witness who has the worst record I've seen points a finger and says, no, he was with me. And you have two trained detectives that say the guy in the Mets hat is Jonathan Arce, not Will Valentin. The defense attorney didn't have a right to put that before the jury for their consideration? Well, yeah, you would have to acknowledge, wouldn't you, that this is a question committed to the sound discretion of the trial court. That's the standard we're applying right now, right? I don't disagree with the standard. Right. And the judge, she was bound by our opinion, Fulton, right? Yes, sir. Okay. And as Judge Montgomery Reeves has just pointed out, Fulton talks in terms of you only use this sort of lay identification work. Not a percipient witness at the crime, but this sort of after-the-fact lay testimony where a person has got enough background that you could say this is going to be helpful for the jury. And you said, oh, these are experienced detectives. But other than the one hour they spent interviewing him, these two detectives, what else is there in the record that shows they had ever laid eyes on Mr. Arce? Your Honor, as far as the record is concerned, I don't think the record was made to that extent as to the familiarity aspect. Mr. Arce and Mr. Valentin are cousins. Yes. Okay. So you've got two detectives. They've got one hour exposure to Mr. Arce, as far as we know. That's it. They make an identification, one definitive, the other less, but still strong. And that's what is presented to the district court judge. I understand how helpful it would have been to your client to have that information, but help us think through the abuse of discretion here. On those facts, is it your position that there's just not a reasonable judge that could look at that and say, one hour, that's just not enough? It's not.  Your Honor, when you're dealing with, as we know, and I'm not trying to be dramatic, when you're dealing with such an important matter, and we know identification is so problematic at times. So many people have been released for jail because of improper identifications. When you have no DNA, yet you have DNA for another person who's been identified by the detectives, please add that in. Because Mr. Valentin had no DNA. The other defendant had DNA, and the detectives said he was the one in the Mets hat. So not only is it their testimony, but it's bolstered by the DNA that, at the very least, he had access or touched the car that was used in the so-called getaway. So it went a little bit beyond just an hour testimony. It was an investigation that resulted in the state of New Jersey, Union County, filing charges against Mr. Arce. Right. Okay. Judge McKee, anything from you, sir? Not really. You only discussed that this is plain error review. And actually, the identification thing here is a pass. It's just a total mess. But I'm not sure that gets us to the point, as in the full movie, had harmless error. I'm not sure that's not what we have here, because the jury was still in a position to look at those photographs. And the jury could determine whether or not the person in the Mets hat was Valentin or Arce. And I've seen this example for Arce. I assume that's the Arce that was acquitted. How, I don't know. But he was acquitted in the first trial. So I just don't know how it rises beyond the threshold of harmless error to get you to harmful error, where in plain error review, abuse of discretion, I'm told by that. I agree that this identification was just an abomination, total abomination. But that doesn't necessarily change the outcome. Well, Your Honor, again, that's one of those things that are very difficult to determine. I don't have the wisdom for saying to you what could have determined or changed the outcome. I can say this to you as a trial attorney, that when I have two detectives that have identified somebody else other than my client, and my client has no DNA, and there's a photograph that you could barely make out on some level, and for the jurors who never saw these people before, Mr. Valentin and Mr. Arce look about as much as my associate, Joe Walter, and I look. They don't look alike at all. So for these detectives. I'm sorry, Your Honor. I can't see your associate. I'm sorry. He's 30 years younger, Judge. He's 30 years younger. So there's no similarity. Your Honor, again, I can't stress it any more. I appreciate everyone's time here today. It's been wonderful to be in front of all of you. It really has. But to me, in a trial where there's an identification like that, and the jury's going to see a picture, and the jury's going to hear from someone else, I believe it should have been admitted, and it could have been dealt with easily, and I'm not sure what the jury would have decided, but I think it was error, plain error, not to allow it. All right. Thank you, Mr. Thank you so much for your time. We'll hear from counsel for the United States. May it please the Court. John Romano for the United States. I'll start with the sentencing issue. Judge, I read with keen interest your Harris opinion the other day, and we all know how difficult the categorical approach is. We all know how maddening it is. This case is, I think, a categorical approach miracle. I mean, what do you need to find? Any offense under federal or state law punishable by imprisonment for a term exceeding one year that has as an element the use, attempted use, or threatened use of physical force against the person of another. What did the jury have to find here? 924C4 tells us, and the jury was charged this way, brandishing means with respect to a firearm to display all or part of the firearm or otherwise make the presence of the firearm known to another person in order to intimidate that person. That's it. Full stop. I mean, that's the element. That's done. Okay. So or force, threat of force, that's what you hear Mr. Pope hitting hard here. It's mentioned in the briefing as well. What's your answer to that point? Well, Your Honor, again, you wrote the Wilson opinion. Intimidation means a threat of force. That's it. I mean, you don't need to go any further than that. This is a simple, straightforward, categorical approach case where we actually have an element that speaks directly to the crime of violence definition. So mirabilit dictu, the categorical approach does not foul things up is what you're saying. Not in this case. And I want to push back, though, on one thing, Your Honor. And I don't agree, and my brief didn't really address this, and I'll throw a flyer out there. I don't think we get to the commentary because of this year. I don't know that we necessarily lose into the commentary. I don't think it's a slam dunk. And I found this as a Judge Hardiman opinion. And I think you were on the panel, Your Honor. It's called the logical fallacy of the inverse. The comment says it is a crime of violence if the underlying thing is a crime of violence. It doesn't say the opposite. It doesn't say it's not a crime of violence if the underlying thing is not a crime of violence. So I don't know that it necessarily follows. I'll just throw that out there. We don't need to get there. Yeah, but exactly. I mean, I take your argument to be we never get to the commentary, period, right? Yes. I think there's no other. And, again, the ambiguity issue isn't, you know, is this a crime of violence? Is this not a crime of violence? The ambiguity issue is, is the term or is the sentence, any offense under Federal or State law punishable by a term of imprisonment that has as an element the use, attempted use, or threatened use of physical force against the person of another? Is that ambiguous? No. It might be very hard to apply. We might have a lot of case law where it's very difficult to apply. But that term itself is not ambiguous. We apply that term all the time. You know, we apply it in 924C. We apply it in all sorts of places. So it's not an ambiguous term. It is what it is. And we can apply that using our normal, you know, tools of statutory construction, which is what you can do here. And, again, I think it's a very straightforward match. It matches almost perfectly. So we do think that this is a crime of violence and that he is a career offender. Okay. Unless Judge McKee or Judge Montgomery-Reeves have a question about this, let's move to the judge's decision to keep out the detective's testimony. And I'll ask to let in Ms. Arce's testimony. I mean, first, I'm curious why the government thought that somebody who hadn't seen their cousin for 13 years was in a position, a la Fulton, to give helpful identification testimony. Well, Your Honor, again, if we start with the actual videotaped interview, which is admissible under Rule 801, that interview, she said she had seen him thousands of times. She had grown up with him. She had seen him at all sorts of events. Yeah, but you, not you personally, but you, the government, knew that those assertions were untrue before she went on the stand. Unless I misread the record, the government told the court and defense counsel, like just before, like the day before or something, yeah, that's all hokum. She hadn't seen him for over a decade, and she maybe saw him, you know, and she certainly didn't see him thousands of times. Well, two points, Your Honor. First of all, I don't think that that's false. What the government was saying is she is now going back on what she's saying. We believe she was telling the truth during the interview. I mean, if you watch the interview, she is perfectly comfortable talking to them. She's very conversational. And the implication or the obvious feeling was now going before her family members in court, she was a little, maybe I shouldn't have said that. So it's not like we sponsored anything that we thought was incorrect. We thought, we think, that she did see him thousands of times. So that's the first thing. The second thing, Your Honor, is, okay, she hasn't seen him in a while, true, but we all, I think, have experiences. I saw, Your Honor, I saw you at a funeral recently. I saw a law clerk of mine that or a law clerk colleague of mine that I hadn't seen in 10 years at that funeral. I knew what he looked like. I had spent many, many days with him. I could pick him out right now. It doesn't mean that I forgot what he looked like. And I think we also need to point out, Valentin is 12 years older than R.C., than Officer R.C. So when she saw him last, even if it was 10, 12 years ago, he was an adult. Maybe he's a little fatter now. Maybe he's a little balder. I don't know. But he was an adult, and he's still an adult. And so I don't think there's anything problematic about that passage of time. I'd also point out, at trial, she picked him out right away. Is Valentin here? Oh, yeah, he's sitting right there. That is such a horrible argument. I was hoping you weren't going to say that. Who the hell is she going to pick out? It's U.S. v. Valentin. Surprise, she picks out the guy sitting at the front. Your Honor, I thought you might say that, Your Honor. And I talked to my boss yesterday. We've went through many transcripts. And we've all had people who either say, oh, I don't know, I don't know if I can pick him out. And my boss pointed out we had a case where the guy actually pointed to a lawyer and said, oh, that's him. So, yes, it happens on occasion. When I was a trial judge in Congress many, many years ago, I had a case where the person pointed me out as the person who stashed the pocketbook. But that doesn't change things. Chances are when you ask a witness in court to identify, look around the room, they're going to identify the person that they know is on trial for the charge. It's an incredibly weak argument. I know a judge in Idaho who does not allow in-court identifications for that very reason. Or what he actually does is he will clear the courtroom and he'll have the defense, the defendant, sit anywhere he wants to in the courtroom. Then they'll bring in the witness and ask for an in-court ID. You know what happens? The DAs start trying to make in-court identifications because they didn't want to run the risk of having to have a witness look around the courtroom without somebody sitting in the goofy chair and identifying someone. It's a worse practice thing to rely upon for validity. I get that, Your Honor. But, again, if she actually hadn't seen him in 15 years and had no idea what he looked like, presumably she would have said, I don't know, I think that's him, maybe, maybe not. But here, and again, she had seen him many, look, the testimony is, even at trial, the testimony is I saw him 50 to 100 times, I saw him on Christmas Eve, I saw him at Thanksgiving's, I saw him at birthday parties. 13 years ago when she was 16 years old.  That might be a long stretch, Your Honor. But I don't think that, again, we're looking at, first of all, I don't know that he actually preserved this challenge, number one. But, number two, even under abuse of discretion review, did Judge Arlio really abuse her discretion by saying, you know what, someone who had seen, again, the videotaped interview was thousands of times. When you say didn't preserve this, this was something the government brought pretrial, right? We want to put her on the stand. Yes. And the other side, did they object? No. I mean, if you look at the record, Judge Arlio says twice. I don't even know if there's an objection to this witness. The defense wanted to get into other things with her. Wanted to get into the, you know, was she treated poorly at the Jetway? You know, did they know, did she? You don't think at the, during this, during this motion in limine that the other side objected to it? No, Judge Arlio didn't think she objected to it. How about with respect to the two detectives not being allowed on? Well, I have to correct the record a little bit. And Mr. Pope didn't try this particular, you know, trial. These two detectives didn't investigate this case at all, as in zero. These two detectives were investigating something previously. Yeah, I understand that. And that's in which they encountered Mr. Arce. But we're, that was objected to. That was preserved that you wanted to put the detectives on. Yeah. Right? So meet the argument, if you would, that if you're going to let, if you're going to let Ms. Arce on to do her, let me tell you about my cousin who I haven't seen for 13 years. In good faith, maybe you ought to let the two people who saw this guy and identified somebody else recently, with the authority of law enforcement and a badge on their chest, get on this stand and say something too. A couple of points on that, Your Honor. And I made almost the exact same argument from this exact same podium, I don't know how many years ago, before Judge McKee. And I thought it was a good argument at the time. And this Court said, no, you don't link those things. Each piece of this is its own thing. If opinion testimony is helpful, it should come in. If the proponent can't show that the opinion testimony is helpful, it doesn't come in. You don't get your weak or poor or nonexistent opinion testimony in just because the other party successfully got opinion testimony in. So these two things should not be linked at all. That's what Fulton says. That argument you made on Fulton, but this is a little bit different. And I remember that exchange now that you mentioned it. I counted it in the opinion. But this is a bit different. The fact that in your brief, what surprised me is – I'm not sure if you personally wrote it, but the brief for the government talks about the fact that it was an hour interview in a sterile interview room. Now, to me, the fact that it's in a sterile interview room greatly enhances the reliability of the identification. The one thing, if they interviewed him in the middle of a concourse where there's all sorts of video games being played, and a totally different thing, if they interview him one-on-one or two-on-one in a, quote, sterile setting where there are no distractions whatsoever and they have an hour to look at the guy's face, that is a much stronger indicia of reliability, it would seem to me, than a cousin who saw him, I don't know, 13, 14 years ago and doesn't know how many times. Your Honor, I would say that that is completely and directly contrary to your opinion of Fulton, because the point of Fulton is if you see people in a variety of settings, I see people when they're wearing this, when they're wearing that. I see them from this angle. I see them from that angle. That is more helpful because you are getting a view of the defendant that the jury doesn't get. The jury is just sitting there. But what I'm trying to get at here is the fact that your attention is focused. What you're arguing is valid, but I'm talking about whether or not the observer's attention is focused on the identifiable features of the person that they're identifying. When you talk about sterile setting, the person's attention is not diverted. That's a little bit different from saying that you can put the person in a very different circumstances in a very different context and make an identification. Well, Your Honor, I would say that that quote is actually directly from Fulton. And, again, if the Fulton witnesses didn't get in because they weren't helpful, then there's no way these witnesses should have got in as being helpful. The Fulton witnesses saw both of the men, unlike these particular witnesses. The Fulton witnesses saw both of them for a fairly decent amount of time. And this Court said, not helpful. They only saw them for a short period of time. They weren't, you know, they didn't have all this interaction with them. They didn't have a lifetime of experience with them. So those witnesses were not allowed or they shouldn't have been admitted. Here, again, these witnesses saw R.C., not Valentin. The record is they probably never have seen Valentin. They saw R.C. for about an hour or two hours. And that's it. And here's another point, Your Honor. Mr. Pope didn't mention this. I'm not sure. Yeah. I'm not sure why them not seeing Valentin makes their testimony less significant or important. Their testimony wasn't it's not Valentin. Well, that's the risk. Their testimony was it's R.C. And if they had, you know, if they'd seen him recently, very recently, is that irrelevant? Your Honor, I think, number one, it's highly misleading. If you look at, again, you can look at my brief where I cite the defendant's brief. And what he says over and over again is they picked out R.C., not Valentin. Look, they thought it was R.C., not Valentin. They couldn't identify Valentin. That's the misleading part of this. They have never seen Valentin. So the idea that they picked out R.C. means what exactly, number one? Well, wait, wait, wait. When you say means what, it means necessarily that it's not Valentin. Unless we're in the Patty Duke show where they're cousins, identical cousins. But, again, Your Honor, you're relying on. If we're not Patty Duke, then the fact that they picked R.C. means they didn't pick Valentin. And that's the thing they wanted to get in front of the jury. I don't know if that's true, Your Honor. But, again, you're relying on someone. Well, why isn't it true? Just like as a real-world, in-the-world thing, if somebody says, I see that picture of, yeah, that's John Romano. That's John. I know John. That's John. Do they have to see me in order for that to mean it's not Kent Jordan, it's not Tamika Montgomery Reeves? Doesn't the fact that they've made a positive idea of John Romano by itself exclude everybody in the world who isn't John Romano? I don't know that that's fair, Your Honor. This is not like a DNA match. I mean, these are people who saw him for one or two hours. And, again, I don't think it's also fair to say that Mr. R.C. and Mr. Valentin look anything like these two individuals. They look pretty close. I mean, they're not like this, and they're not like me and you. They are cousins, and they look like cousins. So that's number one. Number two, the defendant admits in his reply brief they were wrong. Everyone knows they were wrong. It wasn't R.C. And he admits it. It's in his reply brief at page six and seven. And, Your Honor, again, to go back to Fulton, if it's wrong, it's the antithesis of helpful. No one thinks that was Jonathan R.C. We know it's not Jonathan R.C. And I guess your point is, if you're looking at Fulton, the jury is in just as good a position to figure out who this person is. I mean, they're spending more time looking at him than the officers did. They're spending more than the hour with him. They had seven days with Valentin. So, again, it was up to them to decide whether it was Valentin or not. But he knows, we all know, they were wrong. And he says in his reply brief, well, that's why it should have come in. Now, I admit, there might be some theory of relevance about them being wrong, but it's not 701 helpfulness. It's the actual opposite of helpful. It is not helpful. Okay. And, again, Your Honor, even if there was some sort of error here, I would just point out the harmlessness of this. There was a lot of evidence. Yeah. Just take a moment, if my colleagues will indulge me, and answer the point that Mr. Pope made that, sure, he may have had custom jewelry in his possession, but this was months after the fact. He could buy that on the street. It's not as if they caught him, quote, I mean, the words in the brief are red-handed, but the hand had cooled off substantially by the time they caught up with him, right? Sure. I mean, I think that's very helpful evidence, and it's very useful evidence that he had not just the custom pendant, but he had pieces of jewelry with the tags on it from the store, and he had things on his phone. So, obviously, I mean, maybe there's another story there. Maybe he got those stuff later. But there's a lot of other evidence, including not just the co-conspirator, but the phones, and they go dark at the same times, and then the phones are all at the same place when they're stealing the license plate, and then the license plate readers, and, you know, the DNA of the friend. I mean, it's all – there's a lot of evidence here. And Judge Arlia, who is very experienced, called it really overwhelming, and it was. Okay. All right. Thanks very much, Mr. Romano. Mr. Pope, we'll have you back for rebuttal. Yes, Your Honor. Thank you. Judge Jordan, I have to say that I am shocked, shocked to know that you spent your youth watching the Patty Duke show. I could sing the theme song for you right now, Judge McKee, but I'll spare everybody. And anybody who actually gets that cultural reference is sadly as old as you and I are. All right. Go ahead. All right. Thank you. Very briefly, Your Honor, I just want to point out that even though Nassar does change the equation to some extent, it still is one of those things that the guidelines or the commentary is still there. So if there's any ambiguity – and, see, ambiguity in and of itself has a definition. It could be something other. It could be something looked at differently. So if you want to go to Webster's, like John has done, we'll go to Webster's and we'll look at ambiguity. So whenever there's an issue that something could be something other than something else, it seems to me that's ambiguous. But I don't want to get into Webster's dictionaries. What I want to simply say is that I would think – and I don't have any necessarily case law, but there's certainly no case law that's precedential as it relates to the 924C being used for the career enhancement. There's nothing that I've found that addresses that. So you're confronted with a situation here now where this is just not a situation where whether 924 is violence. 924 is clearly a violent act. But it's now – you're using it to make somebody a career offender. Well, you're using it to deal with the elements clause of 4B1.2a. That's what we do. That's what we're – that's what the law requires us to do. And – Why doesn't Stoney get you there? I'm sorry, Your Honor? Why doesn't Stoney get you there? Your Honor, I think Stoney certainly has some similarity to the case, but I still think that the Valentin case rises and falls on its own merits, and specifically because – I don't want to harp on this, but I still think that the jury charge is problematic to the extent that when you ask a jury whether they've been intimidated and you don't give them a definition of intimidation and they come back with intimidation and it's not force and you have the guidelines and the element clause that say you must have force, I think that in and of itself gives rise to going to the commentary and lo and behold some very bright people that took a long time to think about this say you can only use enhanced career offender status if the underlying offense you can do it with and you can't in Hobbs. Yeah, well, but we're not – we're not asking whether Hobbs Act robbery is a crime of violence. I understand, Your Honor. We're asking whether 924C is a crime of violence. But they both are. And we are asking it not – the jury wasn't just asked about intimidation. It was asked about whether the display or all or part of a firearm may – otherwise made the presence of the firearm or otherwise made the presence of the firearm known to another person in order to intimidate that person is something that the jury could find, and they said they did. Once you've – once you've got the jury saying that the display of the firearm to intimidate a person is found and there's the crime, yeah, where's the ambiguity that would make us go, golly, I just don't understand whether that – whether that maps on an implicit threat of force as 4B1.2 requires. It looks like it's a perfect match. When you say it's ambiguous, I'm just struggling to see why you're puzzled by it. Well, Your Honor, you know, when I look at Hobbs Act robbery, which is a crime of violence, but you can't use it for career enhancement, aren't they interpreting violence differently in that regard? No. They're interpreting against the person of another. That's what lay at the heart of Scott, and that's what's not at issue here. But leaving that aside, we're almost through with your time, and I've got to ask you this question. The other side has said there was never an objection to the admission of Officer Arcey's testimony. When they came before the judge, they asked for it to be admitted, and the defense didn't object. In fact, they wanted to get into other things with Ms. Arcey. Your Honor, I pride myself on fair and honest representations to the court always, and my recollection is that Mr. Rubino originally had made some motion to preclude it. I can't point to it, but I can say this, that the court had a 104 hearing. So think about that for a moment. Why do you have a 104 hearing if the defense doesn't object? It seems it goes hand in hand. So there was a hearing on whether Arcey should testify or not. I believe that's the case, correct? I believe that's the case. So that, to me, lends itself to believing that either it wasn't clear or the judge believed there was at least some reason to have the 104 hearing. And I would just add, if I could just on that issue, I think when you're looking at lay people and you're talking about familiarity with lay people, that's understandable. We all could observe things or see things differently. I think when you're talking about eyewitness identification, or identification rather, it's not eyewitness because it wasn't on the scene, but you're talking about identification by trained police officers. And when counsel says that it wasn't, they didn't investigate it. No, the state case was investigated. It was investigated by the state authorities. That's why Mr. Arcey was originally charged in the state. So that was done by the state. When the feds picked it up, the investigators had no interest in it or they had no reason to be involved. But initially, they were involved in that. And I believe that's a difference that I would ask the court to consider as well in making your decision. And once again, thank you so much. Thank you. We've got the matter under advisement. We'll go ahead and recess court. Thanks, counsel.